No. 17-1374

---

In the
United States Court of Appeals
for the Eighth Circuit

---

Roger Durand, Linda Durand, and Priscilla Durand

Plaintiffs-Appellants,

vs.

Fairview Health Services

Defendant-Appellee,

---

On Appeal from the United States District Court
for the District of Minnesota

District Court File No.: 15-cv-2102 (RHK/SER)

---

**DEFENDANT-APPELLEE'S BRIEF**

---

Matthew S. Frantzen (#332793)
Marissa K. Linden (#395564)
Ryan C. Ellis (#386661)
GISLASON & HUNTER LLP
701 Xenia Avenue South, Suite 500
Minneapolis, MN 55416
Phone: (763) 225-6000
Fax: (763) 225-6099
*Attorneys for Defendant-Appellee*

# SUMMARY OF CASE

This matter arises out of the May 7-9, 2013 hospitalization of Shaun Durand, the adult hearing son of Appellants Roger and Linda Durand and the brother of Appellant Priscilla Durand. Roger and Linda are deaf and Priscilla is their hearing adult daughter. Roger and Linda claimed Appellee Fairview Health Services discriminated against them in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* ("ADA"), Section 504 of the Federal Rehabilitation Act, 29 U.S.C. § 794 *et. seq.* ("RA"), and Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et. seq*. ("MHRA"). Priscilla claimed Fairview violated the ADA and RA.

The district court granted Fairview's summary judgment motion after concluding Roger and Linda received an equal opportunity to access services because Fairview undisputedly provided certified American Sign Language ("ASL") interpreters on two occasions and a TTY during the brief hospitalization. The district court also concluded Priscilla did not have standing to bring her claims.

Fairview requests 20 minutes for oral argument if the Court finds oral argument appropriate to address this appeal.

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and this Circuit's Rule 26.1A, the undersigned counsel certifies that Fairview Health Services has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Appellate Case: 17-1374     Page: 3     Date Filed: 05/10/2017 Entry ID: 4534640

# TABLE OF CONTENTS

SUMMARY OF CASE...................................................................................i

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

TABLE OF CONTENTS .................................................................................. iii

TABLE OF AUTHORITIES ..............................................................................v

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE CASE..............................................................................3

    I.  Roger and Linda's Communication Abilities...................................3

    II.  Shaun and Priscilla made Several Key Decisions
        before the May 2013 Admission to Ridges ...................................3

    III.  The May 7-9, 2013 Hospitalization .............................................6

        A.  May 7 .................................................................................6

        B.  An Interpreter was Available for
           More than Two Hours on May 8 .....................................6

        C. An Interpreter was Available
          for at least One Hour on May 9 .....................................15

        D.  Roger and Linda Leave Ridges on May 9 ....................18

        E.  No Interpreter Requests were Made Outside
          of the Conference Context.............................................24

SUMMARY OF ARGUMENT ..........................................................................27

Appellate Case: 17-1374    Page: 4    Date Filed: 05/10/2017 Entry ID: 4534640

ARGUMENT ....................................................................................29

    I.   Standard of Review .....................................................29

    II.  ADA, RA, and MHRA ...................................................30

    III. *Loye* Establishes that Fairview was
         Entitled to Summary Judgment .....................................34

    IV. Fairview had No Obligation to Provide Interpreters
         on a 24/7 Basis ........................................................39

    V.  Fairview was not Required to Ensure or
         Guarantee Comprehension............................................43

    VI. Fairview did not Discriminate
         when it Provided a TTY to Linda ...................................47

    VII. Fairview did not Exclude, Deny Benefits to,
         or Discriminate against Priscilla ...................................49

CONCLUSION ................................................................................55

CERTIFICATE OF COMPLIANCE......................................................56

CERTIFICATE OF SERVICE ............................................................57

iv

Appellate Case: 17-1374    Page: 5    Date Filed: 05/10/2017 Entry ID: 4534640

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ..................................................................30

*Argenyi v. Creighton Univ.,*
  703 F.3d 441 (8th Cir. 2013) .....................................32, 33, 34, 44, 45

*Barstad v. Murray Cnty.,*
  420 F.3d 880 (8th Cir. 2005) ................................................29

*Bishop v. Glazier,*
  723 F.3d 957 (8th Cir. 2013) ................................................30

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ..................................................................30

*Feldman v. Pro Football, Inc.,*
  419 Fed.Appx. 381 (4th Cir. 2011) ......................................33

*Folkerts v. City of Waverly, Iowa,*
  707 F.3d 975 (8th Cir. 2013) ................................................36

*Gorman v. Bartch,*
  152 F.3d 907 (8th Cir. 1998) ................................................31

*Liese v. Indian River Cnty. Hosp. Dist.,*
  701 F.3d 334 (11th Cir. 2012) ..............................................41

*Loeffler v. Staten Island Univ. Hosp.,*
  582 F.3d 268 (2nd Cir. 2009) .........................................53, 54

*Loye v. Cnty. of Dakota,*
  647 F.Supp.2d 1081 (D.Minn. 2009)............................. 2, 28, 32, 34, 35, 36, 37,
  ..... .................................................................. 38, 39, 40, 43, 45, 46, 47

*Loye v. Cnty. of Dakota,*
  625 F.3d 494 (8th Cir. 2010) ..........................................2, 28, 38, 44

v

Appellate Case: 17-1374    Page: 6    Date Filed: 05/10/2017 Entry ID: 4534640

*Martin v. Halifax Healthcare Sys.,Inc.,*
2014 WL 1415647 (M.D.Fla. April 11, 2014) .................................................42

*Martin v. Halifax Healthcare Sys,. Inc.,*
621 Fed.Appx. 594 (11th Cir. 2015).................................... 28, 41, 42, 43, 47, 51

*McCullum v. Orlando Reg'l Healthcare Sys. Inc.,*
768 F.3d 1135 (11th Cir. 2014) ........................... 2, 29, 47, 49, 50, 51, 52, 53, 54

*Meagley v. City of Little Rock,*
639 F.3d 384 (8th Cir. 2011) ...............................................................31

*Nathanson v. Spring Lake Park Panther Youth Football Ass'n,*
129 F.Supp.3d 743 (D.Minn. 2015)....................................................31

*Randolph v. Rodgers,*
170 F.3d 850 (8th Cir. 1999) ...............................................................37

*Robertson v. Las Animas County Sheriff's Dept.,*
500 F.3d 1185 (10th Cir. 2007) ..........................................................37

*Somers v. City of Minneapolis*
245 F.3d 782 (8th Cir. 2001) ..............................................................31

*Stebbins v. Legal Aid of Arkansas,*
512 Fed.Appx. 662 (8th Cir. 2013).....................................................31

*Steger v. Franco, Inc.,*
228 F.3d 889 (8th Cir. 2000) ..............................................................30

*Wood v. SatCom Mktg., LLC,*
705 F.3d 823 (8th Cir. 2013) ..............................................................29

Appellate Case: 17-1374    Page: 7    Date Filed: 05/10/2017 Entry ID: 4534640

## STATUTES AND REGULATIONS

Minn. Stat. § 363A.01 *et. seq.*.................................................................i

Minn. Stat. § 363A.11.......................................................................32

Minn. Stat. § 363A.11, subd. 1(a).......................................................31

28 C.F.R. § 35.130(b)(7)(i)................................................................34

28 C.F.R. § 35.160(a)(1)...................................................................34

28 C.F.R. § 35.160(b)(1)...................................................................34

28 C.F.R. § 36.302(a)........................................................................34

28 C.F.R. § 36.303(c)...................................................................2, 51

28 C.F.R. § 36.303(c)(1)..............................................................33, 34

28 C.F.R. § 36.303(c)(1)(ii)..............................................................33

28 C.F.R. § 36.303(c)(3)....................................................................52

28 C.F.R. § Pt. 36, App. A.........................................................2, 51, 52

28 U.S.C. § 1291.................................................................................1

28 U.S.C. § 1331.................................................................................1

29 U.S.C. § 794 *et. seq.*....................................................................i

29 U.S.C. § 794(a)..............................................................................31

29 U.S.C. § 794a(a)(2)..................................................................31, 49

42 U.S.C. § 12101 *et. seq.*................................................................i

42 U.S.C. § 12182(a)..........................................................................30

42 U.S.C. § 12182(b)(1)(E)................................................................49

42 U.S.C. § 12182(b)(2)(A)(ii)..........................................................32

42 U.S.C. § 12182(b)(2)(A)(iii).........................................................33

42 U.S.C. § 121888(a)(1)...................................................................31

45 C.F.R. § 84.52(d)(1)......................................................................33

## RULES

Eighth Circuit Rule 26.1A ................................................................ ii

Federal Rule of Appellate Procedure 26.1 ........................................... ii

Federal Rule of Civil Procedure 56 ...............................................2, 29

Appellate Case: 17-1374    Page: 8    Date Filed: 05/10/2017 Entry ID: 4534640

## JURISDICTIONAL STATEMENT

The United States District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  The district court granted Fairview's summary judgment motion on January 18, 2017 and the Clerk of Court entered final judgment disposing of all claims with prejudice that same day.  Plaintiffs-Appellants filed their Notice of Appeal on February 16, 2017.  This Court has jurisdiction to hear and decide this appeal under 28 U.S.C. § 1291.

1

## STATEMENT OF THE ISSUES

1.  Whether Fairview was entitled to summary judgment on Roger and Linda's claims.

    **Most Apposite Authority:**

    **Fed. R. Civ. P. 56**

    ***Loye v. Cnty. of Dakota*, 647 F.Supp.2d 1081 (D.Minn. 2009)**

    ***Loye v. Cnty. of Dakota*, 625 F.3d 494 (8th Cir. 2010)**

2.  Whether Fairview was entitled to summary judgment on Priscilla's claims.

    **Most Apposite Authority:**

    **Fed. R. Civ. P. 56**

    ***McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135 (11th Cir. 2014)**

    **28 C.F.R. § 36.303(c)**

    **28 C.F.R. § Pt. 36, App. A.**

2

## STATEMENT OF THE CASE

### I.  Roger and Linda's Communication Abilities.

Linda communicates with Priscilla and the rest of her children through a combination of talking (speaking audibly) and sign language and she homeschooled all of her children in this manner.  (Fairview's Appendix p.2-3 ("FVA.2-FVA.4"), p.15-17, 23-27; Appellants' Appendix p.33 ("A.33"), p.32; A.56, p.42.)  Roger communicates with Priscilla by sign language and by "try[ing] to hear what she is saying," he can hear and understand her voice and read her lips "and see the signs that she's signing and they compl[e]ment each other."  (A.56, p.42; FVA.10, p.28-29.)  When communicating with Linda, Roger uses "total communication" or "anything that works," including speaking, lip-reading, signing, "gestures, expressions, anything.  Environmental cues, anything." (FVA.10-FVA.11, p.27-28, 31.)

### II.  Shaun and Priscilla made Several Key Decisions before the May 2013 Admission to Ridges.

Prior to May 2013, Shaun had been diagnosed with "end-stage heart disease," "multiorgan failure," and "chronic renal impairment."  (*See* A.138-A.151.)  By April 2013, his physicians determined "there is not much more for us to offer."  (A.138, A.148.)

On October 26, 2012, Shaun completed an Authorization to Discuss Protected Health Information, in which he designated four people with whom his

3

medical information could be shared: Priscilla, Pauline, Darlene, and D.J. Durand. (FVA.26.)  In a February 11, 2013 Health Care Directive, he designated Priscilla, a certified medical assistant employed at Fairview Ridges Clinic, to be his sole healthcare agent.  (FVA.27-FVA.33; FVA.35-FVA.37, p.9-17; FVA.47 at ¶ 15.) Roger and Linda were not designated to receive medical information or to make healthcare decisions for Shaun, nor were they involved in medical decision-making in the months and years before his death.  (FVA.26; FVA.26-FVA.33; FVA.5-FVA.6, p.52-54, 57;   A.38, p.58; FVA.13-FVA.14, p.38-40, 46-47 – stating "[t]here was no relationship" between him and his son, he "rarely saw him," he had "[n]ot really" been involved in or been apprised of his son's medical condition in the two years before his death, and when he attended a hospice meeting in December 2012 he "didn't participate" and was "just observing.")  According to Roger, he and his wife "were not part of the planning, making decisions" at Ridges because "I'm pretty sure Shaun didn't really want us to be involved with that, so we stood back.  We were there just to support the family."  (A.95, p.90.)

Priscilla was designated "to represent" Shaun's "wishes" and make his healthcare decisions.  (FVA.27.)  Shaun chose not to have "CPR attempted," which was consistent with a POLST he and Priscilla executed in December 2012. (FVA.30; A.139; FVA.59-FVA.60.)   He also stated, "I would not want Roger, Linda, or Pauline … present" when "nearing my death." (FVA.31.)

4

On April 11, 2013, Shaun and Priscilla participated in a palliative care conference with Amy Klopp, a Fairview advanced practice nurse. (A.139-A.146; FVA.62-FVA.63, p.8-11.) Klopp's note states Shaun "prefers any conversation for decision making be with his sister and HCA Priscilla." (A.140.) Klopp discussed with Priscilla the "appropriateness of hospice if [patient] does not improve or continues to decline[.]" (A.141.) Roger and Linda were present for that conference and an interpreter was provided. (A.150; A.35-A.36, p.41-42; A.62, p. 129; A.92, p.44-45.) Klopp noted Shaun had a "very end of life diagnosis" and that he and Priscilla "clearly understood" Shaun "could die very soon." (FVA.75-FVA.76, p.167-68, 171.)

As of April 2013, Priscilla understood that Shaun had multi-organ failure and did not want to undergo a heart transplant, and she communicated this to her parents without an interpreter. (A.61, p.121; FVA.38, p.122; A.36-A.37, p.43-44, 49; FVA.5, p.50-51; FVA.14-FVA.16, p.48-54.) Priscilla understood Shaun's lifespan was limited and testified her parents also had that understanding. (FVA.38, p.122; FVA.15, p.53 – stating that in April 2013 "we knew that [Shaun] didn't have much time left.")

5

## III. The May 7- 9, 2013 Hospitalization.

### A. May 7.

Priscilla brought Shaun to Ridges on May 7 because his health was "rapidly deteriorating" and he was admitted into the ICU in "guarded" condition. (FVA.47 at ¶ 19; A.63, p.130; FVA.84-FVA.91, FVA.99.) Roger and Linda were not present at Ridges on May 7 and Priscilla did not have any discussions regarding interpreters that day. (A.63, p.131.)

### B. An Interpreter was Available for More than Two Hours on May 8.

Priscilla called Darlene on the morning of May 8 and "had made [her] aware of what was going on with Shaun and that [she] needed to go to the hospital because they were going to be giving him some medicine and most likely he wasn't going to wake up after the medicine was given to him[.]" (FVA.101, p.37.) Priscilla told her, "'[t]his is it so you need to get up here right away,' because after they gave him this medicine, then he's probably not going to wake up." (*Id*.) Darlene went to Roger and Linda's house and told them "to get up to the hospital," she told them "'[d]on't go to work. You guys need to come up to the hospital right away'" and "'[y]ou guys need to go up to the hospital right now. This is probably going to be it.'" (FVA.101-FVA.102, p.37-38.) Darlene received a voicemail from Shaun, in which he told her, "'[t]his is probably it[.]'" (FVA.102, p.39-40.)

6

Linda received an email from Priscilla at 12:00-12:30 p.m. on May 8 and arrived at Ridges with Roger at 1:30 p.m. (A.38, p.58-59; A.63, p.132-133; FVA.17, p.63-64.)

Klopp convened two conferences on May 8. (FVA.92-FVA.98.) The first was with Priscilla and the second was with Roger, Linda, an interpreter, and other family members. (FVA.92; A.63, p.132; FVA.40-FVA.41, p.138-44; FVA.70, p.116; FVA.72, p.123-24; A.105-A.106, p. 129-30, 176.)

The purpose of the first conference with Priscilla was to meet with those "who are in charge of making the decisions." (A.105-A.106, p. 129, 175-76; FVA.81-FVA.82, p.196, 203-04.) Because of Shaun's prognosis, Priscilla made the decision to place him on comfort care. (FVA.39, p.135-36.) She knew Shaun was "going downhill" and she had the "impression" that he was getting "worse" because she had been told,

> at one point in time by a doctor that every time he goes into heart failure, that it would be a little bit worse and he'd have a little bit harder time pulling out of it … I kind of knew that he was in pretty bad shape because he'd been having exacerbations closer and closer together and lasting longer every time.

(*Id*. at 135.) Priscilla acknowledged that during the initial conference, Klopp went

> over real specifics about … what exactly was happening with [Shaun's] heart and his kidneys and his liver and his lungs and what … the different stages would be like, what we could expect, what happens to a person when … they're getting to the final stages of congestive heart failure. I mean, she had gone over a lot of that with us[.]

7

(FVA.40, p.140.) They also discussed turning Shaun's defibrillator off and Priscilla understood they needed to do that so it would not "shock him." (A.67, p.158-159; *see also* FVA.68-FVA.69, p.102-05; FVA.80, p.192 – the decision to turn off a defibrillator would have been made by the patient and/or his healthcare agent and that defibrillators are turned off "only in a dying patient" because "it is a possible source of discomfort to have his defibrillator go off during the dying process.")

Klopp was "unable to speak with Shaun at first and spoke with Priscilla and her brother reviewing understanding of current status, reviewing patient's goals of care, what was important to him, and then developing a plan based on those two things." (FVA.76, p.171.) Klopp stated in her note, "[t]hey do not think [Shaun] would want to again pursue medical care at the U of M and decisions were made to focus on comfort cares[.]" (FVA.92.) After the first conference, Klopp and Priscilla "planned to meet with the whole family" and Klopp knew Priscilla's parents were deaf and needed an interpreter. (FVA.65, p.45-46; FVA.71-FVA.72, p.118, 123; FVA.81, p.194-95; A.63, p.132-33.)

The purpose of the second conference was

> to acknowledge that when a patient is seriously ill, they are not the only people affected by the illness. We like to bring together all of the stakeholders in a patient's life and give them the courtesy of explaining what decisions are made and why so that as the survivors of all of this, they can leave in a place that is somewhat settled with some understanding.

8

(A.106, p.175-76.)  The second conference was also designed "to pull everyone in that holds a stake and give them an opportunity to ask questions and understand what is going on," but that while Klopp would "absolutely take a request into account from a patient's loved ones … any action would need an okay from the patient or the health care agent" because the patient or their agent make the final decisions.  (A. 105, p.129-30; FVA.76, p.169.)

When Roger arrived at Ridges, he found his family and they "explained," without an interpreter, what was going on with Shaun and "got us up to speed on what they knew so far."  (FVA.17, p.64-65.)  When Linda arrived she claims to have gone to the nurse's station and requested an interpreter because she "wanted to know exactly what was going on[.]"  (A.39, p.62.)  An interpreter from a third-party vendor was dispatched at 2:52 p.m., arrived at 3:44 p.m., and participated in a conference with Klopp.  (A.182; A.40-A.41, p.69-70.)

Before the second conference, Klopp and Priscilla "planned to meet with the whole family … And one of us decided or brought up the topic of having an interpreter present."  (FVA.71-FVA.72, p.118, 123; *see also* A.63, p.132-33 - she had a discussion with Klopp on the morning of May 8 "about quite a few things," told Klopp her "parents were coming up there and that I wanted to be able to go over everything with them once they got there," Klopp "said she would come back later and talk to us when my parents were there," and Klopp said or did "something

9

… that indicated that they would have interpreters for them.")  Klopp understood Priscilla's parents were deaf, that they would arrive for the conference, and they both agreed having an interpreter present at the conference "would be a good idea."   (FVA.65, p.45-46; FVA.81, p.194-95; *see also* FVA.64, p.43 - she remembers "discussing the patient's parents were deaf and that it would be beneficial for them to have an interpreter.")

During the second conference, Klopp provided information to Roger and Linda, through an interpreter, about the decisions made earlier by Priscilla, including the decision to elect comfort care, and Shaun's diagnosis and prognosis. (FVA.77-FVA.78, p.180-81, 183-84; *see also* FVA.77, p.177-78 – she "talked about, reviewed [Shaun's] current state and the care up to this point and reviewed his prognosis and that a decision to focus on comfort for the dying patient.  We would have talked about ways in which we manage symptoms and what the dying process can look like").   Klopp stated, "[a]ll of those pieces are a part of my standard of care.  The point of a care conference is to bring the family together to have every person that holds a stake in the person's life have all of that information." (FVA.78, p.181; *see also* FVA.70, p.116 – stating "Roger and Linda being Shaun's parents were present for a second meeting with not just Priscilla, but the rest of the family to kind of go over what decisions were made.")  Klopp also explained to everyone at the conference that Shaun was going to die.  (FVA.77,

p.178.)  Priscilla stated Klopp never said the words "Shaun is dying[.]"  (A.64, p.147.)  However, Priscilla admitted Klopp advised the family that Shaun would be on comfort care but did not "go over what comfort care was," "that they would be giving him medications to control his pain," and that his "ejection fraction was still really low and his kidney function … was dropping."  (*Id*. at 146.)

Klopp answers all stakeholder questions during a conference and she would not have ended it without asking whether the family had questions because she "take[s] a very personal stake in making sure that the stakeholders have the information that they need and are well cared for.  So I would not have left early.  I would have had time to answer every question."  (FVA.78, p.181-82.)

According to Priscilla, the second conference "ended up being way shorter," they "didn't talk about nearly the amount of things that we had talked about earlier that morning," there was less "level of detail," and she felt it was "more to skim over and just give like a cliff notes version of what was happening."  (FVA.40, p.140; A.64, p.146.)  Despite this, she did not ask Klopp to repeat everything from the earlier conference and acknowledged that Klopp did not refuse to repeat information.  (FVA.41, p.142-44.)

Roger said Klopp (through an interpreter) "talked a little bit about what they were doing with Shaun" and talked about "comfort care[.]"  (FVA.18, p.67-68.) He understood they were "keeping [Shaun] comfortable with … medicine and …

11

pain reduction," and he was given "a general idea about what they were doing with [Shaun], … why [Shaun] was there and what they were doing as far as comfort care, but [he] didn't know what that meant yet." (*Id.*)

Linda claims that although an interpreter was present during the second conference, she did not understand the terminology being used, "what [Klopp] was trying to tell us or what was being discussed before she came and talked to us[.]" (A.41, p.70.) She did not ask why her son was unconscious because "there was so much to try to get and there was so much new information coming in at the same time, it was just hard to remember what questions to even ask," but she did not ask Klopp or anyone else to write down information for her. (*Id.* at p.70-73.) Even so, Linda acknowledged she had an opportunity to ask questions to clarify her understanding and, while she did ask some questions, she alleges that "if I had more information, I would have asked more questions, but I didn't know anything coming into that meeting." (*Id.* at p.70.) Linda admitted Roger had "the opportunity" to ask questions through an interpreter but she did not "think he asked." (FVA.7, p.94-95.)

Linda said there was also a meeting with Dr. Malik at approximately 5:00 p.m. (A.42, p.74-76.) An interpreter was present and Linda recalls discussing "comforting" Shaun and that "comfort was the No. 1 key issue[.]" (*Id.* at p.74-76; A.44-A.55, p.85-87.) Linda knew Shaun had a defibrillator and, at or around the

12

time of the meeting with Dr. Malik, "two men … came into the room" to disable his defibrillator and Priscilla told her what they were doing. (A.46, p.92-93; A.67, p.158 – she "explained to" Linda why Shaun's defibrillator was being turned off.) Linda "had the opportunity to ask questions" of Dr. Malik through an interpreter at that meeting, but does not recall if she did. (A.45, p.87-88.)

Roger did not ask any questions during the meetings with Klopp or Dr. Malik because he did not feel there was time and he "pretty much let Priscilla explain to us what was going on." (A.93, p.70-71.) Roger also said,

> I didn't really feel like I had the right to [ask questions] at that time because of my relationship with [Shaun] -- because my relationship with him, not the doctors, I just kind of kept back and observed and I was there for support.
>
> I never talked to any of the doctors or nurses … I was out of the picture … I was standing in the background as they -- I wasn't involved, like I said, in any decision making. I didn't feel like it was my place because Shaun didn't want me around in the past.
>
> Things were getting better, but things don't change overnight, as you know, so I pretty much stayed out of that because sometimes I felt Linda and I were more of bother (sic) than a help by being involved.

(*Id*. at 71; FVA.24, p.118-19.)

Klopp's May 8 note states Shaun's prognosis was "poor," his "understanding of illness" was "good," his "goals of care" were "[f]ocus on comfort and quality. No further interventions aimed at life prolonging," his code status was "Do not resuscitate / Do not intubate," and his sister was his healthcare

Appellate Case: 17-1374    Page: 21    Date Filed: 05/10/2017 Entry ID: 4534640

agent.  (FVA.93.)  Her note also states she spent two hours coordinating Shaun's care and that more than 50% of that time was spent "in counseling, education, [and] coordination of care."  (*Id*.)  However, Klopp testified that she might have actually spent more than two hours coordinating Shaun's care but, for billing purposes, she never bills more than 120 minutes for an initial consult.  (FVA.66-FVA.67, p.55-57; *id.* at p.55 – she "remember[s] spending a lot of time in the ICU" with "Shaun and his family throughout the day"; *see also* FVA.73, p.133 – she "likely spent more than 120 minutes in all on [Shaun's] care.")

The interpreter left Ridges at 6:00 p.m., two hours and sixteen minutes after she arrived.  (A.182 -A.184.)  Roger never told the interpreter he wanted her to stay after the conferences ended, never told her he would need her for interpreting later that evening, and never advised anyone that he needed an interpreter after the conferences.  (FVA.20, p.79-81.)  Indeed, Roger "never asked for an interpreter ever for the whole time" while at Ridges.  (FVA.19, p.76-77; FVA.21, p.87-88.) He instead asked "the kids later … in a quieter environment" about what had transpired and they "just kind of summarized what they had talked about … it was a meeting about palliative care, comfort care, telling me what they were doing to keep [Shaun] comfortable … I didn't ask a lot of questions."  (A.93, p.72-73.)  He let Priscilla "explain to us … what she felt free to share with us at that time and I figured she would let us know what the important things were[.]"  (*Id*. at 73.)

14

Linda did not ask for another interpreter on May 8 or advise Fairview she wanted an interpreter present in Shaun's room once the interpreter left Ridges. (A.45, p.89; *see also id*. – she never advised Fairview she wanted an interpreter for two-to three-hour blocks of time.)

Roger and Linda stayed at Ridges overnight and "didn't bother" Priscilla because they "generally knew what was happening, so we didn't want to put pressure on" her by asking questions about Shaun's medical condition and decision-making. (A.94, p.82-83.)

**C. An Interpreter was Available for at least One Hour on May 9.**

Klopp convened another conference on May 9 and an interpreter was present for Roger and Linda. (A.47-A.48, p.100-02; FVA.78-FVA.79, p.184-85, 187-88; ECF Doc. No.83-12, p.797-99.) Klopp's note states, "[a]fter discussions yesterday, focus of care has been shifted to comfort only, support [patient] symptomatically during dying process." (ECF Doc. No.83-12, p.797.) Her note states Shaun's prognosis was "[p]oor, dying," the "goals of care" were "[c]omfort [c]are, no further interventions or monitoring not intended for comfort," and that she had "[s]pent much time with family for support and discussion about dying process and ways of managing symptoms. Interpreter present for parents." (*Id*. at 798; *see also* FVA.104 – medical record prepared by Dr. Dorn stating she was "[c]alled as patient appears to actively be dying, having seizure like activity.

15

Discussed with sister Priscilla who was identified as decision maker, goals are only for comfort measures at this time. Have ordered comfort care orders, [i]t is unlikely patient will survive this hospitalization, or even the next 24 hours.")

Linda acknowledged an interpreter was present during this entire conference and documents establish that an interpreter was available from 12:00 to 1:00 p.m. (A.47, p.101; FVA.107; A.185-A.188.) She testified that Klopp "mentioned about sending Shaun home and that my family – I remember Pauline mentioning that she felt like he should stay to make him more comfortable." (A.47, p.101.) Linda understood the decision was made by her children to keep Shaun at Ridges because "[t]hey didn't feel it was the right time to move him to home yet" and they did not believe they could care for him. (A.48, p.102-05; *see also* FVA.83; FVA.105-FVA.106 – medical record prepared by Dr. Malik stating, "[p]atient and family met with palliative care team yesterday and decided on comfort cares. I again met with family and palliative [care] teams and decision was made [that] patient stay in the hospital for another day or two, family is not comfortable taking him home at this time … Comfort cares here, will transfer to[] 5th floor.") Linda understood Shaun was being moved out of the ICU and that "he wasn't going to receive more care[.]" (A.49, p.106-07.)

> Priscilla wanted to honor Shaun's
>
> wishes … to be at home … but at the same time … he wasn't
> conscious at all, and to transport him home would have been really

Appellate Case: 17-1374    Page: 24    Date Filed: 05/10/2017 Entry ID: 4534640

risky and we didn't know that he would even make the transport …
the family was … not real comfortable about bringing him home[.]

(A.73-A.74, p.185-86.)  Priscilla understood Shaun was being transferred out of

the ICU because he

> didn't need … the quick response team and they didn't need … all
> that equipment available and ready for them … they'd rather use that
> bed and that area for somebody that is going to benefit from it,
> because … with what they were planning on doing at that point, there
> was no need for it.

(A.74, p.188-89.)

Appellants claim they made a "standing request" for interpreters. (*See e.g.,*

Appellant's Brief, p.10.) But they never told Klopp that Roger and Linda wanted

an interpreter for any time outside of the conferences; however, Klopp would have

"looked into the ways of making that happen" had a request been made.  (FVA.77,

p.177; FVA.79, p.188; FVA.81, p.194-95.)   Further, no one told her that

Appellants wanted or required an interpreter in Shaun's room at all times, or that

they wanted or required an interpreter on a continuous, around-the-clock, 24/7

basis.  (FVA.79-FVA.80, p.188, 191-92.)

In May 2013, Priscilla understood her parents had a right to an interpreter

and that Fairview could not make her interpret against her wishes.  (FVA.37, p.15-

17; A.60, p.116-17.)  Priscilla admitted she was never "pressure[d]" to interpret

and was never told that Fairview would not obtain an interpreter for her parents

because they wanted her to interpret.  (A.69-A.70, p.168, 170.)

17

### D. Roger and Linda Leave Ridges on May 9.

Roger and Linda left Ridges at 4:00-4:30 p.m. on May 9 and returned home to shower and so Roger could go to work. (A.49-A.50, p.109-10; A.95, p.90-91.) When he left Ridges, Roger understood there "was a chance" his son could "take a turn for the worse" and he "wanted to stay," but he "couldn't be gone away from [his] job for too long." (A.96, p.95-96; *see also* A.98 at p.105 – stating his son "was close. He was close. You never know when you're going to hear something.")

Once they left Ridges, Roger and Linda devised a plan that she would leave a voicemail for him at his workplace via TTY to advise him if Shaun "had a turn for the worse" and he would ask his supervisor to "check his phone quite often, not just at the beginning and end of the shift," to see if there was a voicemail regarding Shaun. (A.96-A.97, p.95, 99-100; A.99, p.109; FVA.22, p.110; A.50, p.110-11.) Roger provided a business card to Linda that included a telephone number for his employer's HR department, a call into that number "just went to a recording and then" someone at the office "would check the messages." (A.97-A.98, p. 99-102; FVA.108-FVA.109.) Prior to May 9, neither Linda nor "anyone" else had ever contacted Roger at work, much less at the provided number. (A.98, p.103-04.) Further, except for the HR voicemail, there was no way for anyone to contact Roger at work because he did not have access to email or own a cell phone and

Appellate Case: 17-1374   Page: 26   Date Filed: 05/10/2017 Entry ID: 4534640

Linda did not have other numbers for him. (*Id.* at p.104; FVA.11-FVA.12, p.33-34; A.53, p.125.) Priscilla "didn't know anything" about this plan "at the time" and Roger and Linda did not tell Fairview about it. (FVA.42, p.212-13; FVA.25, p.130-31.)

Linda returned to Ridges at 8:00 p.m., eventually understood "this was the end of" Shaun's life "any time now," and knew she needed to contact Roger. (A.49-A.50, p.109, 112.) Linda went to the front desk on two occasions, "used [her] voice" to make a verbal request to Fairview employee Debra Huitt for a communication device, and a TTY was brought to Shaun's room for her use. (A.50-A.53, p.112-18, 121-23; A.109, p.19-20; FVA.110.)

Ms. Huitt did not immediately provide a TTY to Linda because she mistakenly believed they were only provided for patient use. (A.109-A.110, p.20-21.) However, Ms. Huitt agreed to provide the TTY when Linda made a second request "[w]ithin an hour." (A.110, p.23-24.) Before the initial request, Roger and Linda had never advised anyone at Fairview that they needed a TTY in Shaun's room because they "really didn't need it. I mean, we didn't need to contact anyone." (A.52, p.118; FVA.24, p.118 and A.78, p.214 – she was not aware of any requests for a TTY or other device prior to Linda's request on May 9.) Further, Linda did not request an interpreter at any time once she returned to Ridges on the evening of May 9. (FVA.8, p.127.)

19

After Linda's second request for a TTY, Ms. Huitt met a security officer at the interpreter office (a three- to five-minute walk from the fifth floor), the security officer unlocked the office, the TTY was checked out, and she brought it to Shaun's room. (A.111-A.112, p.25-26, 28-29; FVA.110.)[1] Ms. Huitt unpacked the TTY, provided Linda with written instructions, and intended to set it up, but Linda spilled a drink, became "flustered," and "waved … off" Ms. Huitt, who then left the room. (A.111-112, p.28-29; A.113, p.66-68; FVA.112-FVA.113, p.34, 59.) Priscilla also testified that a drink was spilled, Linda "shooed" the "nurse" "away" and "was like 'Let me do it,'" and Linda "got it hooked up and started trying to dial out." (A.78, p.214-15.) This testimony establishes a drink was spilled and that Linda dismissed Ms. Huitt from the room.

The instructions for the TTY state, "dial 9 (for outside line)," and were included with the TTY. (A.221; FVA.116-FVA.119.) Linda is "familiar with a TTY device, so she started plugging in the cords and making the connections, getting it on, turning it on." (A.52-A.53, p.121-22.) Roger said all pieces of the TTY were found and that Linda was "able to connect" the TTY. (FVA.23, p.114.)

---

[1] While it is true that Ms. Huitt incorrectly recalled providing a videophone (not a TTY), the evidence establishes that she did provide a TTY to Linda. (A.110-A.111, p. 22, 26 – testifying she retrieved a video phone and checked out a device at the interpreter office; FVA.110 – establishing that a TTY was checked out.)

Appellate Case: 17-1374    Page: 28    Date Filed: 05/10/2017 Entry ID: 4534640

However, she "kept getting a busy signal" and "couldn't get through" because she failed to dial 9 to get an outside line. (A.52-A.53, p.121-23; FVA.43, p.220-21.)

Ms. Huitt testified she "brought it up to the room. I took it to the table in the room and opened the box that it came in and put it on the table." (A.111, p.28.) She then "unpacked everything on the table." (A.112, p.29; *see also* FVA.113, p.59 – she "took the box to an available table to unpack it. There is a sheet of instructions inside. I set the equipment on the table.") Linda's testimony is consistent with Ms. Huitt on this issue:

> [t]hey brought the box with the TTY in and they brought it into the room where – and then I brought it into the room where Shaun was and they followed. They took the TTY out of the box and immediately I helped because I could see that she obviously didn't understand how to connect it.

(A.52, p.121.)

Linda testified there were "no instructions there, no instructions left with me, just – and they even took the box … There was no explanation on the printer about the TTY. I mean, no information that warned me that I need to dial out with a 9 first, nothing in print." (A.53, p.123.) But whether Linda had access to written instructions is a red herring because photographs establish that the telephone and TTY provided to her had a sticker that stated, "MN Relay: (9)711 OR (9)1-800-

21

627-3529."  (FVA.118-FVA.119; ECF Doc. No. 85-29.)[2]  In addition, Appellants admitted during the summary judgment hearing that "it's not about instructions at all" because they now claim that Fairview failed to provide "the separate telephone required to connect the TTY to the hospital's phone system[.]"  (FVA.131; Appellant's Brief, p.15.)  Not only is there no evidence anywhere in the record indicating a telephone was not provided to Linda, but Appellants' claim is also belied by the fact that Linda is familiar with a TTY, made the necessary connections, turned it on, and began dialing.  (A.52-A.53, p.121-22.)  This claim is also undermined by Roger's testimony that all parts of the TTY were found and that Linda was "able to connect" the TTY.  (FVA.23, p.114.)  The problem was not Fairview's failure to provide the necessary equipment; the problem was that Linda failed to dial 9 despite the instructions that were stuck to the TTY and telephone. (A.52-A.53, p.121-23; FVA.43, p.220-21; FVA.120-FVA.127.)

During this same period of time, Priscilla "called" Roger's workplace and "got a machine," but "didn't leave a message" because she "wasn't sure if it was a machine that's even checked on … at that time of night, so [she] didn't leave a message."  (A.78, p.216-17.)  Pauline also attempted to contact Roger, but "got a

---

[2] Exhibit 29 of Appellants' memorandum in support of partial summary judgment (ECF Doc. No. 85-29) included photographs of the TTY equipment and instructions.  However, the copies provided to the district court were blurry and obscured the text of the stickers and instructions.  Fairview has provided this Court with clear copies of these photographs. (FVA.120-FVA.129.)

Appellate Case: 17-1374    Page: 30    Date Filed: 05/10/2017 Entry ID: 4534640

recording" and "tried" to leave a message. (FVA.133, p.89.) However, she does not know whether she left a voicemail because she did not "know if [she] was supposed to push something or somehow send or – to get a message here or there or where" and she made no effort to call again. (A.123, p.90.) Pauline told Linda she would not make any more calls because, according to Darlene, "she was getting frustrated at that point because she was like 'I don't know what you want me to do. It goes to this answering machine. It's not going to do anything.'" (FVA.103, p.70.) Roger understands his daughters "tried to call" "one time each," but … they got an answering machine which they didn't expect and so they hung up … And then it seemed like they stopped trying." (A.98, p.103; FVA.22, p.113.)

Shaun died before anyone contacted Roger, and Linda verbally advised Ms. Huitt that she needed to "'get ahold of my husband. He is not answering his phone.'" (FVA.112, p.35.) Ms. Huitt offered to call Roger's workplace, but Linda advised her that "no one was in the office," so she offered to "Google a different number," but Linda again told her "no, no one was in the office." (*Id*.; FVA.114, p.61.) Ms. Huitt "call[ed] the police." (FVA.112, p.35; *see also* A.98-A.99, p.105-07; FVA.23, p.114 – Linda "asked" Ridges staff "to call the police to get a hold of me," and he was eventually notified of his son's death when the police were sent to his workplace.) Appellants never advised Ms. Huitt that they needed an interpreter. (FVA.113-FVA.114, p.58, 62.)

23

The police told Roger they were "'sorry to give you the bad news, but your son has passed away and your family asked me to contact you[.]'" (A.99, p.107.) The police verbally communicated this information to Roger because "nobody" at his workplace "knew sign language" and he "understood" what they were telling him. (*Id*. at 106.)

### E. No Interpreter Requests were Made Outside of the Conference Context.

Nurse Kathryn Lewis provided care to Shaun in the ICU and recalls he "was at the end of life," was placed on comfort care, and had "many family members around and that he directed his care." (FVA.135-FVA.136, p.7-11; FVA.145, p.82-83.) Lewis understood Roger and Linda were deaf and she observed them communicating via sign language with their children, including Priscilla. (FVA.136-FVA.137, p.12-14; FVA.141-FVA.142, p.30-33; FVA.147, p.116.)

Lewis asked Shaun whether he wanted an interpreter for Linda, but he told her "his siblings would interpret for her." (FVA.139, p.23-24; FVA.144, p.51-52; FVA.149-FVA.151, p.123, 125-27, 129-31.) Lewis said Priscilla was present during this conversation with Shaun and that "no interpreter was requested when offered." (FVA.141, p.30.) Lewis testified that Priscilla "told me that she would interpret for them" and it was "clear to" Lewis that the Durands "would interpret." (FVA.142-FVA.143, p.36-37.)

24

Lewis acknowledged Fairview prefers not to use family members to interpret, but "[i]f the patient requests that or if family members offer and it is acceptable for the patient, yes, family members are used for interpretation." (FVA.138-FVA.139, p.20-21.)  In this case, she stated it was Shaun's decision because he "was the patient," "it is the patient's decision."  (FVA.139-FVA.140, p.24-25; FVA.146, p.110-112.)  Lewis did not have Shaun sign an interpreter "waiver" because it is only required when the patient (not a family member or companion) needs an interpreter.  (FVA.140, p.25-26.)

At no time did anyone ever ask Lewis for an interpreter or otherwise tell her that an interpreter was needed for Roger and Linda.  (FVA.139, p.23-24; FVA.148-FVA.149, p.118-19, 123.)  Had a request for an interpreter been made, she would have obtained one if approved by Shaun or Priscilla because of "HIPAA laws" and because "the patient … has the choice and the decision … to decide who gets the information[.]"  (FVA.148-149, p.120-23.)

According to Priscilla, Lewis

started off asking Shaun … if my parents needed an interpreter and he kind of waved her off … he didn't really give her an answer.  He kind of deferred to me.  And she asked me … if I would interpret and I told her no … I don't know what she did with that information … I know she didn't get an interpreter … I don't know what she thought was going to happen.

25

(A.64, p.148-49.)  Notably, Priscilla did not testify that she advised Lewis that her parents required an interpreter.  Priscilla said Lewis' version of events constitutes a lie.  (A.64-A.65, p.149-51.)[3]

Julie Kahn, an LPN who provided care to Shaun on May 9, remembers him because he died in her arms, and no one ever asked her for an interpreter.  (FVA.153-FVA.156, p.8-11, 28-29; FVA.158, p.40; FVA.163, p.88.)  Kahn understood Priscilla was Shaun's healthcare agent and Priscilla never told her she was unable to interpret for her parents or otherwise asked for an interpreter.  (FVA.164, p.90-92.)

During the change of shift report on May 9, Lewis told Kahn that Roger and Linda were deaf and that "a sign language interpreter had been declined in the room," the family decided they wanted to interpret for Roger and Linda, and the family "didn't want staff in the room".  (FVA.158-FVA.160, p.40-42, 61; FVA. 162-FVA.165, p.78, 88, 91, 95-96.)  Kahn said staff was "asked to stay out of the room" for "[p]rivacy," which was not an "uncommon request" for a comfort care patient because "[t]hey just want to be with their loved one and their families."  (FVA.158, p.37-38.)

---

[3] Because of the divergence in testimony, Fairview did not base its motion for summary judgment on the interaction Lewis had with the Durand family.

Appellate Case: 17-1374     Page: 34     Date Filed: 05/10/2017 Entry ID: 4534640

Nurse Amy Saladis provided care to Shaun on May 9. (FVA.167-FVA.170, p.8-9, 26- 27.) Neither Roger, Linda, nor any Durand family member or friend advised her that an interpreter was needed. (FVA.173, p.102.)

Priscilla eventually advised Saladis that they "were unsuccessful in contacting" Roger, and Linda verbally advised Saladis she was "having difficulty contacting her husband" and requested a TTY. (FVA.171-FVA.173, p.32-33, 101.) Saladis escorted Linda to Ms. Huitt and advised her that Linda wanted a TTY. (FVA.172, p.33, 35-36.) Prior to Shaun's death, Saladis was never told there was a problem retrieving or using the TTY. (FVA.173-FVA.174, p.104-07.) Linda never told Saladis that TTY pieces were missing. (FVA.174, p.106.)

Lawrence Langston provided nursing care to Shaun in the ICU. (FVA.178-FVA.179, p.17.) Whenever Langston is asked by a patient or their agent for an interpreter, he will enter that request into the medical record. (FVA.184-FVA.185, p.101-02, 109.) However, none of the records he created for the care provided to Shaun include any such request, which means to him that no one ever requested an interpreter. (FVA.184, p.102-03.)

## **SUMMARY OF ARGUMENT**

The district court appropriately concluded that Fairview did not discriminate against Appellants and properly granted Fairview's summary judgment motion.

27

It is undisputed that an interpreter was provided for Roger and Linda during conferences with Klopp on May 8 and 9 and for a meeting with Dr. Malik on May 8. During these conferences, Klopp discussed Shaun's medical condition, prognosis, and the decisions that had been made for his care. Roger and Linda were given the opportunity to ask questions with the assistance of an interpreter. Their claims must fail because Fairview provided Roger and Linda with effective communication and an equal opportunity to gain the same benefit as hearing family members by making interpreters available for communication with Shaun's medical providers. *See Loye v. Cty. of Dakota,* 647 F.Supp.2d 1081, 1090-92 (D.Minn. 2009), *aff'd,* 625 F.3d 494 (8th Cir. 2010).

Fairview also provided a TTY to Linda within one hour of her request and any delay in the provision of the TTY was not based on her disability. Any delay did not amount to a "denial," but even if it did, "not every denial of a request for an auxiliary aid ... creates liability under the ADA or the [RA]." *Martin v. Halifax Healthcare Sys., Inc.,* 621 Fed.Appx. 594, 602 (11th Cir. 2015). Further, Appellants cannot establish that a delay in providing a TTY was the reason Roger was not contacted before Shaun's death. Instead, the plan to leave a voicemail at Roger's workplace with the hope it would be received in time, Priscilla and Pauline's failure to leave a voicemail, and Linda's failure to dial "9" prevented contact.

28

To prevail on her claims, Priscilla must establish "exclusion, denial of benefits, or discrimination that [she herself] suffer[ed]." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.,* 768 F.3d 1135, 1143 (11th Cir. 2014). But there is no evidence whatsoever that Fairview denied Priscilla any benefit, good, or service based on her association with her parents. Perhaps most significantly, Priscilla testified that no one at Fairview ever expressly asked her to interpret for her parents or otherwise "forced" her to do so.

## ARGUMENT

### I.     Standard of Review.

Summary judgment is appropriate and shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court "reviews de novo a grant of summary judgment, viewing all evidence and reasonable inferences in the light most favorable to the nonmoving party." *Barstad v. Murray Cnty.*, 420 F.3d 880, 883 (8th Cir. 2005). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts" and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013).

29

Summary judgment must be granted if a plaintiff fails to support each "element essential" of their case because "[i]n such a situation there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "By its very terms," the standard set forth in Rule 56 "provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (emphasis original).

On review, this Court "may uphold a grant of summary judgment for any reason supported by the record, even if different from the reasons given by the district court." *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013).

## II.    ADA, RA, and MHRA.

Title III of the ADA prohibits any person who owns, leases, or operates a place of public accommodation from discriminating against an individual on the basis of disability in the full and equal enjoyment of the services of the public accommodation. *See* 42 U.S.C. § 12182(a); *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) (observing that Title III "proscribes discrimination in places of public accommodation against persons with disabilities"). The RA states that

30

"[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of [their] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). "The ADA has no federal funding requirement, but it is otherwise similar in substance to the [RA], and 'cases interpreting either are applicable and interchangeable.'" *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (internal citation omitted).

Title III "does not provide for private actions seeking damages[.]" *Stebbins v. Legal Aid of Arkansas*, 512 Fed.Appx. 662, 663 (8th Cir. 2013). Instead, a private party may only seek injunctive relief under Title III. 42 U.S.C. § 121888(a)(1). While injunctive relief and compensatory damages may be sought under the RA, compensatory damages may only be awarded if intentional discrimination is proven. 29 U.S.C. § 794a(a)(2); *Meagley v. City of Little Rock*, 639 F.3d 384, 388-90 (8th Cir. 2011).

The MHRA prohibits denying anyone the full and equal enjoyment of the services of a public accommodation because of a disability. Minn. Stat. § 363A.11, subd. 1(a). MHRA claims are analyzed identical to ADA claims. *Somers v. City of Minneapolis*, 245 F.3d 782, 788 (8th Cir. 2001); *Nathanson v. Spring Lake Park Panther Youth Football Ass'n*, 129 F.Supp.3d 743, 749 (D.Minn. 2015) (observing that the "Minnesota District Court has held that federal precedent

31

may be used to construe the MHRA and that analysis under the ADA controls a MHRA claim"). When analyzing the ADA, RA, and MHRA, courts have held that "[e]ach statute prohibits discrimination on the basis of disability" and "[f]or analytic purposes, each is identical." *Loye*, 647 F.Supp.2d at 1086.

Ridges, "a place of accommodation" as defined by the ADA, receives funding from the United States Government and is thereby covered by the RA, and is an entity covered by the requirements of the MHRA (Minn. Stat. § 363A.11). (FVA.51-FVA.54 at ¶¶ 45, 52, 60; FVA.190 at ¶ XX.) Roger and Linda are deaf and communicate, at least in part, via ASL and, for purposes of summary judgment, Fairview did not contest they are qualified individuals with disabilities. (FVA.46-FVA.47 at ¶¶ 8-11; FVA.187 at ¶ VII.) Despite these admissions, they still had an obligation to establish that Fairview discriminated against them based on their disability. *See Argenyi v. Creighton Univ.*, 703 F.3d 441, 447 (8th Cir. 2013). They did not, and cannot, establish such a claim.

Discrimination is defined as a failure to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford … services … to individuals with disabilities, unless … taking such steps would fundamentally alter the nature of the … service … or would result in an undue burden[.]" 42 U.S.C. § 12182(b)(2)(A)(ii). Discrimination is also defined as a "failure to take such steps as may be necessary to ensure that no individual with a

32

disability is … treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii). Regulations promulgated under Title III and the RA indicate that such steps may include furnishing "appropriate auxiliary aids and services" to individuals with disabilities when needed to ensure effective communication or when necessary to afford equal opportunity to benefit from the service in question. 28 C.F.R. § 36.303(c)(1); 45 C.F.R. § 84.52(d)(1).

The regulations advise that while public accommodations "should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, … the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii). Indeed, "[t]he auxiliary aid requirement is a flexible one." *Feldman v. Pro Football, Inc.*, 419 Fed.Appx. 381, 392 (4th Cir. 2011).

Further, while the ADA, RA, and MHRA are broad in scope, there is no requirement "to provide all requested auxiliary aids and services," only "necessary" auxiliary aids are required. *Argenyi*, 703 F.3d at 448; 28 C.F.R. § 36.303(c)(1); 45 C.F.R. § 84.52(d)(1). In analyzing what auxiliary aids or services are "necessary[,]" this Court has looked to the RA, applied a "meaningful access" standard, and held:

33

Under a "meaningful access" standard, we have decided that aids and services "are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons," but they nevertheless "must afford handicapped persons equal opportunity to ... gain the same benefit." The Eleventh Circuit has similarly concluded that the "proper inquiry" under the [RA] to determine if a hospital had provided "necessary" auxiliary aids to a hearing impaired patient was whether the proffered aids "gave that patient an equal opportunity to benefit from the hospital's treatment."

*Argenyi*, 703 F.3d at 449 (internal citations omitted).

## III. *Loye* Establishes that Fairview was Entitled to Summary Judgment.

*Loye* was decided within the context of public entities (ADA Title II), rather than public accommodations (ADA Title III), but the regulations promulgated under both require the provision of appropriate auxiliary aids where necessary to ensure effective communication and a reasonable modification in policies, practices, or procedures to avoid discrimination. 647 F.Supp.2d at 1088; 28 C.F.R. § 35.130(b)(7)(i); 28 C.F.R. § 35.160(a)(1), (b)(1); 28 C.F.R. § 36.302(a); 28 C.F.R. § 36.303(c)(1). *Loye*'s analogous facts and the manner in which the district court and this Court applied the law to those facts is dispositive and establishes that Fairview provided effective communication to, and did not discriminate against, Appellants. This Court should, therefore, affirm summary judgment.

In *Loye*, four deaf plaintiffs alleged the county's response to a mercury contamination constituted discrimination because it failed to provide them with interpreters during cleanup efforts and follow-up meetings. 647 F.Supp.2d at

34

1083-86.  Appellants focus on the emergency response aspect of *Loye* and assert it is inapposite to what happened at Ridges.  But in the weeks following the emergency response to the contamination, the county held several community meetings to update and explain the decontamination process, to provide counseling, and to answer questions.  *Id.* at 1085-86.  That is the aspect of *Loye* that controls here; it is the aspect Appellants ignore.

The plaintiffs in *Loye* alleged interpreters were provided for some, but not all of, the post-contamination meetings.  *Id.*  Despite this, it was undisputed that even if interpreters were not provided for all meetings, subsequent meetings were arranged where an interpreter was available and deaf individuals were given the opportunity to ask questions.  *Id.* at 1090-91 (noting the county had "arranged an ASL-interpreted private meeting" so if a plaintiff "had questions about what had happened at" an earlier meeting, "she had an opportunity to ask later that day").  This is exactly what happened during the conferences with Klopp, Dr. Malik, and the interpreters at Ridges on May 8-9, 2013.

Further, one of the *Loye* plaintiffs claimed that even when interpreters were provided they "did not always receive effective communication" because she claimed the interpreter "worked exclusively with" other plaintiffs.  *Id.* at 1091.  The district court in *Loye* stated, "[w]hether an interpreter is needed in any particular situation is … fact-specific" and the defendant "need not 'employ any

35

and all means' to make auxiliary aids available, but must make 'reasonable modifications.'" *Id*. at 1090 (internal citation omitted). It also observed that someone is "denied the benefit of … services when" they do not receive "'meaningful access' to those services" and noted the "meaningful access" standard "strikes a balance between 'two powerful but countervailing considerations – the need to give effect to the statutory objectives and the desire to keep [the statutes] within manageable bounds.'" *Id*. at 1087, 1090.

The *Loye* court observed the "[p]laintiffs insist an interpreter is mandated for every meeting," but concluded "[t]hey are incorrect" and "decline[d] to hold an interpreter must absolutely be provided for every meeting, regardless of the circumstances." *Id.* at 1091. Instead it held "[t]he Supreme Court's balance between effecting the statutory objectives and maintaining manageable bounds … reasonably means not every event can be interpreted in real time. There must, however, be effective communication and, when needed, reasonable modifications." *Id.*; *see also Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 979-80, 983-84 (8th Cir. 2013) (affirming summary judgment in favor of defendant where an adult with an "intellectual disability" was charged with "lascivious conduct" after being interrogated by a police officer without "communicative assistance" because "reasonable accommodations," including an "altered questioning style," were provided consistent with the ADA and RA.)

36

Significantly, the district court then concluded, "[i]f no interpreter was present at a particular meeting" it is "a reasonable modification to afford deaf plaintiffs an opportunity to learn the information presented at the meeting and ask questions within a reasonable time." 647 F.Supp.2d at 1091. The *Loye* court also noted that although two of the plaintiffs "may have monopolized the interpreter's attention," the other plaintiff "acquiesced" and "[n]othing, and certainly no act by the [defendant], prevented [the plaintiff] from asking the interpreter to assist her. But she did not." *Id*. at 1091.

Appellants site to several cases in support of reversal, but these cases are inapposite, bear no resemblance to what happened at Ridges, and counsel in favor of affirming summary judgment. *See, e.g., Randolph v. Rodgers*, 170 F.3d 850, 853-54, 858-59 (8th Cir. 1999) (reversing summary judgment in favor of the plaintiff, a prison inmate whose "primary means of communication" was ASL and who had requested and was denied interpreters during disciplinary proceedings over a five-year period of time); *Robertson v. Las Animas Cnty. Sheriff's Dept.*, 500 F.3d 1185, 1187-90, 1200 (10th Cir. 2007) (reversing summary judgment in favor of defendant in case where a deaf/hard of hearing inmate was never provided with an auxiliary device or "any form of hearing assistance" while in jail.)

Like the plaintiffs in *Loye*, Roger and Linda were also provided with opportunities to obtain information and ask questions via an interpreter and no act

37

by Fairview prevented them from doing so.  The *Loye* court concluded the county "provided reasonable and effective communication" and granted summary judgment.  647 F.Supp.2d at 1092; *see also Loye*, 625 F.3d at 501 (affirming summary judgment).  The district court in this case observed that Roger and Linda "claim they did not receive that opportunity, asserting a lack of auxiliary aids caused them to misunderstand Shaun's condition and caused Roger's absence when Shaun died."  (A.25.)  But it rightfully held that "the record, viewed in the light most favorable to them, simply cannot sustain their assertion" because "it is undisputed that Fairview secured live, on-site interpreters … on May 8 and 9" and there is no claim that the interpreters "were ineffective."  (*Id*.)  By communicating with Klopp (twice) and Dr. Malik, the district court correctly concluded that Roger and Linda "gleaned important information from these conversations – they both understood that the focus was on comforting Shaun, and that Shaun would no longer receive care."  (*Id*.)

Noting that while Roger and Linda "assert this communication was ineffective because they 'didn't understand the terminology,'" the district court observed that "the ADA did not require Fairview to ensure that Roger and Linda comprehended what its doctors were communicating."  (*Id*. at n. 9.)  Instead, the ADA "required an 'equal *opportunity*' for Roger and Linda to gain the same benefit as its hearing visitors."  (*Id*.) (emphasis original)  The district court

38

correctly held that Fairview did indeed provide them with this opportunity and this Court should affirm that ruling. (*Id*.)

## IV. Fairview had No Obligation to Provide Interpreters on a 24/7 Basis.

Appellants claim Fairview failed to provide "reasonable accommodation for multiple interactions with physicians," including during physician rounds and with Lewis, and that Fairview should have provided such accommodations because Roger and Linda were "appropriate people with whom" Fairview "should communicate." (ECF Doc. No. 89 at 30-32.) In so claiming, Appellants would have this Court believe that the ADA, RA, and MHRA obligated Fairview to provide Roger and Linda with an interpreter for each and every single contact Ridges staff had with them and their family. (*See also,* FVA.197-FVA.199.)

But such an obligation was rejected in *Loye*. 647 F.Supp.2d at 1091. Fairview was not required to provide an interpreter for every contact with Roger and Linda, but, pursuant to *Loye*, could instead provide effective communication and reasonable modifications by affording them the opportunity to obtain information and ask questions via an interpreter at a later meeting. *Id*. That is undisputedly what happened at Ridges.

Klopp held a conference with Roger, Linda, an interpreter, Priscilla, and other family members on May 8. The purpose of that conference was to provide information regarding Shaun's diagnosis and prognosis, to explain what decisions

39

had been made, and to provide an opportunity to ask questions and understand what was going on, including the decision to elect comfort care. Dr. Malik met with Roger, Linda, and an interpreter that same day. The evidence establishes that an interpreter was available to them for more than two hours on May 8. Further, Klopp convened another conference on May 9, where an interpreter was present for Roger and Linda for another hour. Comfort care and the dying process were again discussed during that conference, and they also discussed whether to keep Shaun in the hospital and that he would be moved out of the ICU.

Pursuant to *Loye*, there is no support for any claim that the ADA, RA, or MHRA required the presence of an interpreter for every contact with Fairview staff. 647 F.Supp.2d at 1091. Instead, the question is whether effective communication was provided to Roger and Linda. *Id.* The *Loye* court held effective communication was provided when the plaintiffs were given the opportunity to ask questions at a subsequent meeting, even if an interpreter was not provided at an earlier meeting. *Id.* Roger and Linda were undisputedly given that opportunity and were, therefore, provided effective communication. Whether they took full advantage of those opportunities and their time with the interpreters was out of Fairview's control.

What Appellants believe the law requires amounts to 24/7, "round-the-clock" access to interpreters. But Fairview had no need or obligation to provide

interpreters on such a basis. *Id*. Indeed, the plaintiffs in *Martin* alleged they were discriminated against because the hospital failed to provide "continuous live interpreting services … throughout the duration of their stay at the hospital[.]" 621 Fed.Appx. at 596. One of the plaintiffs, a patient who was hospitalized for five days, claimed he "repeatedly requested a live ASL interpreter …, but that while an interpreter was present some of the time, during the majority of the time there was no live interpreter." *Id*. at 597. When a live interpreter was not available, the hospital "tried to communicate with him through friends and family, written notes, and gestures, but he was unable to understand any of the information the staff attempted to provide." *Id*. Another plaintiff, the deaf mother of a patient that delivered a baby, was provided with five hours of live interpreting services over the course of her daughter's four-day stay at the hospital. *Id*. at 598.

The *Martin* court framed the issue as whether the hospital discriminated against the plaintiffs "by failing to provide a live ASL interpreter every time an interpreter was requested" and stated, "not every denial of a request for an auxiliary aid … creates liability under the ADA or the [RA]" because, if that was the case, then "a requested service would automatically be transformed into a 'necessary' service merely by the fact that it was requested." *Id*. at 601-02; *see also Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012) (stating "both parties agree" that "the simple failure to provide an interpreter on

41

request is not necessarily deliberately indifferent to an individual's rights under the RA" and that "construing the regulations in this manner would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid").

The *Martin* court affirmed summary judgment in favor of the hospital because it understood "the basis" of one of the plaintiff's discrimination claims to be that "he did not receive round-the-clock live ASL interpreting services during his hospitalization" and held, "a hospital is not required by the ADA or the [RA] to provide every auxiliary aid that is demanded." 621 Fed.Appx. at 603-04; *see also Martin v. Halifax Healthcare Sys., Inc.*, 2014 WL 1415647, *4 (M.D.Fla. April 11, 2014) (granting the hospital's summary judgment motion and noting the plaintiffs "have not cited, and this Court has not uncovered, any precedent obligating a hospital to provide a live ASL interpreter on every occasion when medical personnel wish to communicate with a deaf person").

The district court in this case stated that although Appellants "insist[] that they did not expect interpreters around-the-clock, they contend Fairview *should have* provided interpreters" during "various incidents when Shaun received care but no interpreter was provided." (A.26) (emphasis original.) But again relying upon *Loye*, the district court rightfully observed that "'not every event can be interpreted in real time'" and that "[n]o provision of the ADA required Fairview staff to withhold treatment from Shaun until they secured a live interpreter for his

42

visiting parents." (A.26-A.27.) Quoting *Loye*, the district court correctly concluded that

> uninterrupted auxiliary aids were not required for Fairview to communicate effectively: "[i]f [Roger and Linda] had questions about what had happened [earlier, they] had an opportunity to ask later … *This* is effective communication; providing interpreters at subsequent meetings and arranging for a private meeting within a reasonable time were reasonable modifications."

(A.27.)

The analysis of *Loye* and *Martin* establishes that the law did not require Fairview to continually provide interpreters for every contact with medical staff. Fairview did not, therefore, discriminate against Appellants.

## V. Fairview was not Required to Ensure or Guarantee Comprehension.

Appellants acknowledge interpreters were present for the conferences and the meeting with Dr. Malik, but they claim Roger and Linda did not receive certain information, including that Shaun's death was imminent and the meaning of "comfort care." But Appellants admit that Klopp and Dr. Malik discussed Shaun's comfort and Klopp discussed how Shaun was doing and what was being done as far as comfort care. And the information Roger and Linda received during the conferences was the same information everyone else received.

Priscilla testified that during the conference with Roger, Linda, the interpreter, and other family members, Klopp discussed the fact that Shaun was going to be on comfort care, but "[s]he didn't go over what comfort care was."

43

(A.64, p.146.)  Priscilla also testified that Klopp never said the words "Shaun is dying[.]"  (*Id.* at 147.)  Based on Priscilla's own testimony, Roger and Linda undisputedly received the same information everyone else did.  It cannot, therefore, be said that Fairview failed to provide necessary auxiliary aids and services to ensure effective communication.  Again, and despite any questions they might have had or information they felt they lacked or did not understand, it is undisputed that Roger and Linda had the opportunity to ask questions with the assistance of an interpreter, but apparently chose not to do so.

What Appellants seem to argue is that Fairview had an obligation to ensure Roger and Linda understood the information provided.  This is akin to requiring that Fairview guarantee comprehension.  But not only would such a standard be impossible to meet, it is not what is required under the law.  As this Court noted favorably in *Loye*, "'benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to … gain the same benefit.'"  625 F.3d at 499 (citation omitted).  Therefore, Fairview is not required to guarantee comprehension or even "produce the identical result or level of achievement for handicapped and nonhandicapped persons[.]" *Argenyi*, 703 F.3d at 448.  Instead, the auxiliary aids and services must afford

44

"equal opportunity to ... gain the same benefit." *Id.* That was undisputedly done when Fairview provided interpreters for Roger and Linda's benefit.

Linda claimed, "if [she] had more information, [she] would have asked more questions;" however, it can also be said that she would have had more information if she had asked more questions. (A.41, p.70.) Any misunderstanding Roger and Linda claim to have had could have been mitigated if they simply asked for additional information during the more than three hours when interpreters were available to them. Further, Roger did not ask questions because he did not feel it was his place given the nature of his relationship with his son. This had nothing to do with Fairview.

Effective communication is accomplished when, as here, interpreters are provided at subsequent meetings and an opportunity to ask questions is given. *See Loye*, 647 F.Supp.2d at 1091. Like the defendant in *Loye*, Fairview cannot be faulted for Roger and Linda's acquiescence and failure to ask questions when given the opportunity. *Id.*

> As the district court correctly held, Roger and Linda
>
> did not seek access to the Hospital's services as a patient, a patient's spouse, or a patient's health care decision maker, a fact that distinguishes this case from nearly every case they rely upon. They played no role in Shaun's health care, as evidenced by their testimony and Shaun's health care directive. Accordingly, Fairview had no duty to ensure they received certain information regarding Shaun's condition.

45

(A.24-A.25.) Relying on this Court's decision in *Loye*, the district court found that the ADA simply "entitled them to an equal opportunity to gain the same benefits accorded similarly-situated hearing visitors," an opportunity which Fairview provided to Roger and Linda "by securing ASL interpreters at their request." (A.25 at n. 9.) Significantly, the district court perceptively held that their "preparations" regarding the plan they devised to contact Roger at his workplace "belie their claim that they did not understand Shaun's prognosis and, hence, that communication from Fairview was ineffective." (A.26.) "Faced with these facts," the district court correctly concluded that "no reasonable jury could conclude the absence of auxiliary aids was discriminatory or led to ineffective communication." (*Id.*)

> Based upon the undisputed facts, the district court rightly held that
>
> Roger and Linda received an equal opportunity to access the services Fairview provided hearing visitors: before they arrived at the Hospital, they understood Shaun's lifespan was likely limited. At the Hospital, they met with his treating physician and nurse (twice) *with the aid of effective interpreters*. They learned that the focus was on comforting him, that he would be moved out of the ICU, and that he would no longer receive care. They had the opportunity to ask questions … Absent a genuine issue whether Fairview effectively communicated with them, their claims must fail.

(A.27) (emphasis original.) This Court should affirm summary judgment on the same bases.

46

## VI. Fairview did not Discriminate when it Provided a TTY to Linda.

Appellants claim discrimination related to the provision of a TTY to Linda, but the ADA, RA, and MHRA "prohibit[] discrimination on the basis of disability[.]" *Loye*, 647 F.Supp.2d at 1086. Ms. Huitt did not immediately provide a TTY to Linda upon her request; however, the delay in providing the TTY was not based on Linda's disability. It was based instead on the mistaken understanding that TTYs were only for patient use. This is not "discrimination on the basis of disability" and is not a violation of applicable law. Further, and to the extent any delay in providing the TTY could even be considered a "denial" of Linda's request, "not every denial of a request for an auxiliary aid … creates liability under the ADA or the [RA]." *Martin*, 621 Fed.Appx. at 601-02.

Also, to have Article III standing at the summary judgment stage a plaintiff must come forward with evidence establishing "a causal connection between the injury and the conduct complained of[.]" *McCullum*, 768 F.3d at 1145. Appellants, therefore, had the burden to show that Fairview's delay in providing a TTY was the reason Linda could not contact Roger. Appellants failed to make that showing.

The facts establish it was not any delay by Fairview that prevented Linda from contacting Roger. Instead, it was a series of circumstances that had nothing to do with Fairview and, as the district court noted, "[i]t is undisputed that Linda

47

made no effort to arrange a TTY until the moment she required it." (A.28.) The plan they devised entailed Linda calling Roger's work and leaving a voicemail for him. While waiting for the TTY, Priscilla and Pauline attempted to call their father's work and Pauline tried to leave a voicemail. Despite these efforts, Roger did not receive a message before his son died. No reasonable jury could find that Roger would have received a message from Linda if he did not receive the voicemail Pauline attempted to leave.

Further, after receiving the TTY, Linda attempted to call Roger's workplace, but was unable to get an outside line because she did not dial "9" despite the instructions clearly written on the TTY indicating that needed to be done. (FVA.121-FVA.127.) The reason Linda was unable to contact Roger was not because of any delay in providing a TTY or because she was missing parts for the TTY. The reason Linda was unable to contact Roger was because she failed to follow the instructions for getting an outside line.

Appellants cannot establish that Fairview's delay in providing the TTY had anything to do with a disability and they cannot establish that any such delay was the reason Linda was unable to contact Roger. The district court properly concluded that "[o]n these facts," there is "no violation of the law." (A.28.)

Appellate Case: 17-1374   Page: 56   Date Filed: 05/10/2017 Entry ID: 4534640

## VII. Fairview did not Exclude, Deny Benefits to, or Discriminate against Priscilla.

Although it is "widely accepted that under both the RA and ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person[,]" those claims are limited. *McCullum*, 768 F.3d at 1142 (citations omitted).

> The section of the ADA conferring standing on a non-disabled party states that "[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."

*Id.* (*quoting* 42 U.S.C. § 12182(b)(1)(E)). As the Eleventh Circuit held:

> On its face § 12182(b)(1)(E) recognizes only certain kinds of injuries that may form the basis of an ADA suit brought by a non-disabled individual. The text makes clear that a non-disabled individual has standing to bring suit under the ADA only if she was personally discriminated against or denied some benefit because of her association with a disabled person.

*Id*. Further, the RA provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 … shall be available to any person aggrieved by any act or failure to act[.]" 29 U.S.C. § 794a(a)(2); *see also McCullum*, 768 F.3d at 1143.

The "threshold for associational standing under both the RA and the ADA is the same: non-disabled persons have standing to seek relief under either statute only if they allege that they were personally excluded, personally denied benefits,

49

or personally discriminated against because of their association with a disabled person." *McCullum*, 768 F.3d at 1143. The Eleventh Circuit analyzed associational standing in the context of a non-disabled person seeking relief under the ADA and RA for not providing an ASL interpreter in a hospital – facts nearly identical to Priscilla's claim. *Id.* The Eleventh Circuit "[r]eject[ed] the contention that non-disabled individuals may seek relief under the RA and ADA for injuries other than exclusion, denial of benefits, or discrimination that they themselves suffer," holding "[i]f that contention were correct, it would mean that Congress granted non-disabled persons more rights under the ADA and RA than it granted to disabled persons, who can recover only if they are personally excluded, denied benefits, or discriminated against on the basis of their disability." *Id.*

Priscilla's claims are premised solely on Fairview's alleged failure to provide her parents with an interpreter and because she allegedly had to "interpret" for them. Even if Fairview had failed to provide interpreters for her parents, Priscilla has failed to allege or establish how Fairview "excluded, denied benefits to, or discriminated against" her. *See McCullum*, 768 F.3d at 1143. The facts establish Priscilla was never excluded from Shaun's medical care or decision-making and she was not otherwise excluded, denied benefits, or discriminated against. She thereby fails to meet the threshold for associational standing and her claims were properly dismissed.

50

Appellants attempt to argue that a change in regulations eviscerates *McCullum* and allows Priscilla's claim to proceed. Effective March 15, 2011, 28 C.F.R. § 36.303(c) was amended to include a provision stating that "[a] public accommodation shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication, except" under certain circumstances. But any such argument that this new provision trumps *McCullum* is a red herring.

It does not appear that any court has overruled *McCullum*. Further, the Eleventh Circuit based its holding on interpretation of the statutory provisions of the ADA and RA that confer associational standing, not the regulations promulgated under those statutes. *See id.* at 1142-45. Accordingly, a change in the regulations would not affect the holding. *See also Martin*, 621 Fed.Appx. at 596-99, 601-04 (affirming summary judgment even though interpreters were not always provided to deaf patients or family members in June and August 2011, three and five months after 36.303(c) was amended, and hospital relied, at least in part, on "friends and family" to interpret.)

It is also helpful to review the DOJ's own guidelines and comments regarding changes in the regulation. The DOJ stated the provisions of 28 C.F.R. § 36.303(c) that took effect March 15, 2011 "do not impose new obligations on places of public accommodation." 28 C.F.R. § Pt. 36, App. A. Rather, these

51

provisions simply codify DOJ's "longstanding positions." *Id.* It cannot, therefore, be said that the change diminishes *McCullum.* Moreover, despite the new regulations being effective since March 15, 2011, Fairview has been unable to identify a case where a court has recognized a cause of action by a non-disabled person against a public accommodation premised on a violation of § 36.303(c)(3). *See McCullum*, 768 F.3d at n. 5 (the Court had "no occasion to decide whether a plaintiff may assert a cause of action premised on a violation of § 36.303(c)(3)). Even if such a cause of action was available, the DOJ guidelines establish that it would not apply in this case.

Further, the DOJ guidelines establish that the new provisions of § 36.303(c) were promulgated to prevent public accommodations from "requiring or forcing" disabled persons to bring other individuals with them to facilitate communication and coercing another adult to provide effective communication. *See* 28 C.F.R. § Pt. 36, App. A. There was no force or coercion in this case. Indeed, Priscilla, as an employee of Fairview, knew that Fairview could not force her to interpret for her parents. (A.60, p.117.) Priscilla also admitted she was never "pressure[d]" to interpret and was never told Fairview would not obtain an interpreter for her parents because they wanted her to interpret. (A.69-A.70, p.168, 170.) Priscilla's testimony establishes she was never coerced, forced, or required to interpret.

52

The district court adopted the holding in *McCullum* and concluded that non-disabled individuals, like Priscilla, "may only recover for the 'exclusion, denial of benefits, or discrimination that they themselves suffer[ed].'" (A.28.) The district court noted that Priscilla claims Fairview "violated the law by 'forcing' her to communicate with Roger and Linda when no qualified interpreter was present," but concluded "there is simply no evidence in the record suggesting that Fairview compelled Priscilla to interpret … or even requested that she do so." (A.29.) The district court found that Fairview "fulfilled its obligations to Roger and Linda" and thereby concluded "there is no evidence in the record of any benefit, good, or service that Fairview denied *Priscilla* based on her association with Roger and Linda." (*Id*.) (emphasis original.)

Appellants have doubled down on *Loeffler v. Staten Island Univ. Hosp.* in support of Priscilla's claim. This reliance is misplaced because, as the district court observed, the case at bar "is a far cry from *Loeffler*[.]" (A.30.) In *Loeffler*, the minor children of a deaf patient made "numerous attempts to secure an interpreter from the hospital" in the "days and weeks leading up to" their father's surgery. 582 F.3d 268, 270-71 (2nd Cir. 2009). One of the interpreter requests was "laughed" off by the surgeon and another physician "patted" the child on the back and "laughed it off like usual." *Id*. at 271-72. A physician "dismissed" the child's "demand for an interpreter, 'just kind of laughed it off, and played it as a

53

joke'" and the court in *Loeffler* characterized the manner in which the physician responded to the situation as "apathetic." *Id.* at 276-77. The family "continued to rely on" their minor children to interpret, the children "stayed out of school to remain on duty as translators," and the hospital provided one of the children with a pager "so she could be 'on call'" to interpret when needed. *Id.* at 273. It became so bad that the family brought a lawsuit during the hospitalization and the court "issued an order to show cause compelling the" hospital to "provide a sign language interpreter," after which time "interpretive services" were provided. *Id.* at 273. The *Loeffler* court reversed a summary judgment order in favor of the hospital after concluding there was a genuine issue of material fact as to whether the hospital was "deliberately indifferent" and whether its "indifference to" the family's rights was "so pervasive as to amount to a choice." *Id.* at 268, 277.

The facts of *Loeffler* bear no resemblance to what occurred at Ridges. Indeed, the *Loeffler* facts are so "extreme" and egregious that they are entirely distinguishable from this case and establish that a claim like Priscilla's ought to be limited to circumstances where the public accommodation required, forced, or coerced individuals to provide effective communication. *See McCullum*, 768 F.3d at 1144-45 (characterizing the *Loeffler* facts as "extreme" and observing that the *Loeffler* plaintiffs "repeatedly asked hospital officials to provide a sign language interpreter for their deaf father, but those requests were persistently ignored or

54

'laughed off,'" that the hospital "conscripted" the patient's children to serve as interpreters, "going so far as to give one of the children a pager so she could be 'on call,' and causing both children to miss more than a week of school").  That did not happen at Ridges and Pricilla's claims were properly dismissed.

## <u>CONCLUSION</u>

For all of these reasons, the Order of the district court granting summary judgment in favor of Fairview should be affirmed.

Respectfully submitted,

Date: May 10, 2017

/s/Marissa K. Linden
Matthew S. Frantzen #332793
Marissa K. Linden #395564
Ryan C. Ellis #386661
GISLASON & HUNTER LLP
Attorneys for Defendant-Appellee
701 Xenia Avenue South, Suite 500
Minneapolis, MN  55416
Phone:  (763) 225-6000

Appellate Case: 17-1374    Page: 63    Date Filed: 05/10/2017 Entry ID: 4534640

## CERTIFICATE OF COMPLIANCE

1.    This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this Brief contains 12,961 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

2.    This Brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief was prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

3.    This Brief complies with the Eighth Circuit Local Rule 28A(h), and this Brief has been scanned for viruses and to the best of my knowledge is virus-free.


Date: May 10, 2017                       /s/Marissa K. Linden
                                         Matthew S. Frantzen #332793
                                         Marissa K. Linden #395564
                                         Ryan C. Ellis #386661
                                         GISLASON & HUNTER LLP
                                         Attorneys for Defendant-Appellee
                                         701 Xenia Avenue South, Suite 500
                                         Minneapolis, MN  55416
                                         Phone:  (763) 225-6000

Appellate Case: 17-1374    Page: 64    Date Filed: 05/10/2017 Entry ID: 4534640

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2017, I electronically filed the foregoing Brief of the Defendant-Appellee with the Clerk of the Court for the United States Court of Appeals for the Eight Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: May 10, 2017

/s/Marissa K. Linden
Matthew S. Frantzen #332793
Marissa K. Linden #395564
Ryan C. Ellis #386661
GISLASON & HUNTER LLP
Attorneys for Defendant-Appellee
701 Xenia Avenue South, Suite 500
Minneapolis, MN  55416
Phone:  (763) 225-6000

2135740.1

57